# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MELISSA HUFFMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| THE LINCOLN NATIONAL LIFE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## **COMPLAINT**

COMES NOW Plaintiff, Melissa Huffman, and for her claims and causes of action against Defendant, The Lincoln National Life Insurance Company, states as follows:

## PARTIES

1.  Melissa Huffman ("Huffman") is a resident and citizen of the State of Kansas.

2.  Defendant The Lincoln National Life Insurance Company ("Lincoln") is an out-of-state insurance company authorized to do business in the State of Kansas. The Commissioner of the Kansas Department of Insurance is authorized to accept service of process on behalf of Lincoln.

## JURISDICTION AND VENUE

3.  Huffman brings her claim pursuant to the Employment Retirement Income Security Act ("ERISA") and 29 U.S.C. § 1001 *et seq.*

4.  This dispute is governed by a welfare benefits plan and its policy documents, as well as applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

5.    This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6.    Venue lies in the District of Kansas under 29 U.S.C. § 1332(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7.    Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

## INFORMATION REGARDING TRIAL

8.    No jury trial is allowed under ERISA law.

9.    Trial is to be held in Kansas City, Kansas.

## STATEMENTS OF FACT

10.   Essilor of America ("Essilor") employed Huffman as an Office Worker.

11.   Huffman remained actively at work until March 23, 2020.

12.   During her employment, Huffman was an "active, full-time employee working in the United States."

13.   During her employment, Huffman began to suffer from a number of health conditions, including ongoing complications from paralyzed diaphragm, Degenerative Disk Disease, COPD, long Covid, lumbar and cervical arthritis, right sciatic pain, and bone spurs. These conditions eventually rendered her incapable of continuing her job on a full-time, competitive basis.

14.   Essilor sponsored a group long-term disability ("LTD") benefits plan ("Plan") for its participating employees.

15.   The Plan constitutes employee welfare benefit plans as defined by 29 U.S.C. § 1002 (1).

16.   The Plan offered disability benefits to qualifying Essilor employee Plan participants.

17.   At all relevant times, Huffman has been a participant and covered person under the terms of the Plan.

18.   Essilor is the administrator of the Plan.

19.   The Plan's disability provisions are insured by a policy written by Lincoln.

20.   Essilor delegated or attempted to delegate the function of issuing LTD claim determinations to Lincoln.

21.   Essilor and Lincoln entered into an administrative services contract through which Essilor paid Lincoln for acting as claims administrator.

22.   Huffman attempted and failed working for the last day on March 23, 2020, but remined employed by Essilor until July 11, 2022.

23.   After having to cease work, Huffman through counsel, requested all plans in which she was enrolled as of her last day working.

24.   Essilor complied with the request and produced among other plan documents, the short-term and long-term disability policies.

25.   Following this document production, Huffman applied to Lincoln for long-term disability ("LTD") benefits, submitting a signed application form and a Representation Authorization, and a list of her health care providers.

26.   The Plan and Policy articulate the conditions under which a Plan participant is entitled to LTD benefits.

27.    The Policy defines the term "Disabled" as follows:

**"Disability"** or **"Disabled"** means:

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

   i.    that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

   ii.   thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

28.    Both ERISA and the Policy itself require such denials to provide specific information, including:

   a. The specific reason(s) the claim was denied.

   b. Specific reference to the Policy provision(s) on which the denial was based.

   c. Any additional information required for the claim to be reconsidered, and the reason this information is necessary.

   d. If the case of any claim for a disability benefit, identification of any internal rule, guideline or protocol relied on in making the claim decision, and an explanation of any medically-related exclusion or limitation involved in the decision.

   e. A statement regarding the right to appeal the decision, and an explanation of the appeal procedure, including a statement of the right to bring a civil action under Section 502(a) of ERISA if the appeal is denied.

29.    On April 20, 2023, Lincoln denied Huffman's claim finding that she failed to provide proof of claim.

30.    Huffman appealed Lincolns denial on October 17, 2023.

31.    Huffman timely appealed Lincoln's denial of her claim for benefits and provided medical evidence in support of her disability.

32.    In 2010 Huffman began to experience bilateral shoulder pain and was diagnosed with
       adhesive capsulitis and moderate focal supraspinatus of the left shoulder confirmed by
       MRI and underwent a right rotator cuff surgery.

33.    On April 24, 2013, Huffman underwent another MRI that revealed supraspinatus
       tendinosis with a moderate grade anterior partial thickness tear. Huffman underwent a
       second rotator cuff repair surgery that did not resolve her shoulder problems.

34.    In 2018 Huffman again had shoulder surgery.

35.    In 2019 Huffman suffered from a right shoulder strain.

36.    On April 1, 2019, May 14, 2019, August 5, 2019, May 5, 2020, June 2, 2020, and July 7,
       2020, Huffman saw Dr. Michalski and reported fatigue.

37.    On May 9, 2020, April 7, 2020, August 4, 2020, and September 3, 2020, Huffman was
       seen by Dr. Nicholas Michalski, for weight management.

38.    In 2020 Huffman's medical conditions worsened and she began experiencing difficulty
       lifting and carrying heavy boxes as required by her occupation.

39.    On December 14, 2020, Huffman was seen by Dr. Michalski, for cough.

40.    On January 28, 2021, Huffman was seen by Dr. Michalski, for left shoulder pain for 1
       week.

41.    On February 1, 2021, Huffman was seen by Dr. Aakash Shah, Orthopedics, for insidious
       onset left shoulder pain for 3 weeks. Huffman reported that she had tried oxycodone with
       minimal improvement. Huffman reported previous left shoulder arthroscopy with rotator
       cuff repair, subacromial decompression, and distal clavicle excision on 4/6/2018. On
       exam Huffman demonstrated pain with terminal overhead range of motion and active
       forward flexion and abduction to approximately 120 degrees. Huffman's x-ray showed

prior suture anchors to be in position and a mild proximal humeral migration. Dr. Shah
performed a steroid injection with lidocaine and ordered a MIR.

42. On February 13, 2021, Huffman underwent an MRI of her left shoulder that showed
suspected full-thickness supraspinatus tear/re-tear distally at the footprint, progression of
now moderate infraspinatus, mild supraspinatus muscle fatty infiltration, and mild fluid
subacromial/subdeltoid bursa, further supporting an underlying rotator cuff tear.
Nonvisualized long head biceps tendon may be due to the prior tenotomy, full thickness
tear and distal retraction, or atresia and displacement.

43. On February 15, 2021, Huffman was seen by Dr. Shall, for follow-up. Huffman's MRI
showed suggestion of insertional rotator cuff, artifact from her prior surgery. Dr. Shall
recommended range of motion exercises and scheduled a return in 6 weeks.

44. On March 8, 2021, Huffman underwent a chest x-ray showing an elevated left diaphragm.

45. On March 8, 2021, Huffman was seen by Dr. Timothy Smith, Pulmonology, for a new
patient evaluation. Dr Smith recorded that Huffman reported cough and shortness of
breath present for several months and had Covid back in November 2020. Dr. Smith
opined that Covid seemed to aggravate her condition and that it probably dated back
several months prior to November. Huffman was dyspneic on exertion, had some
wheezing and noisy breathing., and had a history of allergies but not asthma. Dr. Smith
stated that he talked to Huffman about possible chest trauma and she reported that she
had fallen off the horse on a couple of different occasions. Huffman had smoked about a
pack a day for 30 years. She had recently been on Symbicort 80/4.52 puffs twice a day
but developed sore throat and difficulty swallowing and at urgent care was told she had
thrush and placed on nystatin swish and swallow. She had stopped her Symbicort at that

time. Chest x-ray showed a high left hemidiaphragm. She had some shortness of breath

when lying flat. Dr. Smith obtained a spirometry showing moderately severe obstruction

with a small vital capacity. Dr. Smith opined that her shortness of breath may be

multifactorial. Dr. Smith was concerned about the possibility of left hemidiaphragm

dysfunction based on the chest x-ray and ordered a sniff test. Dr. Smith suggested

Huffman will probably need to do an alpha-1 antitrypsin level, stopped Symbicort and

switch her to Anoro 1 inhalation daily, ordered a lung cancer CT chest screen, and

scheduled a return in 4 weeks.

46.    On March 11, 2021, Huffman underwent a sniff test that found elevation left

hemidiaphragm at rest, normal right diaphragmatic version during breathing, and

paradoxical motion of the left diaphragm. The sniff test findings were consistent with

diaphragm paralysis of the left hemidiaphragm.

47.    On April 1, 2022, Huffman underwent a chest CT that found small pulmonary nodules.

48.    On April 12, 2021, Huffman was seen by Dr. Smith, for a follow up. Dr. Smith stated that

the Anoro medication did not seem to do much good. Dr. Smith also reviewed her recent

CT scan for lung cancer screening, finding mild emphysematous change and a high left

hemidiaphragm. Huffman's pulmonary function test showed moderate airway obstruction

with a low diffusion consistent with COPD with emphysema. Dr. Smith found that

Huffman had stage 2 moderate COPD and diaphragm paralysis, and that she has a history

of recurrent respiratory infections. Dr. Smith stopped Anoro and prescribed Breztri and

scheduled a return in 6 weeks with a spirometry.

49.    On April 13, 2021, Huffman was seen by Dr. Michalski, for a urinary tract infection.

50.     On May 24, 2021, Huffman saw Dr. Smith again who record that she was still having some shortness of breath. Dr. Smith performed a COPD assessment finding a score of 13 indicating mild symptom impairment. Dr. Smith recorded that Huffman had concomitant left hemidiaphragm paralysis which may have played a role in her symptoms. Dr. Smith reviewed the spirometry finding a mixed pattern with airway obstruction and restriction, continued Breztri 2 inhalations twice a day and scheduled a return in 6 months with a spirometry.

51.     On July 27, 2021, Huffman saw Dr. Michalski. On examination Dr. Michalski noted tenderness of the frontal sinus area. The assessment and plan noted unspecified acute sinusitis, other fecal abnormalities, weight loss, body mass index 25.0-25 point 9, and overweight. Clindamycin was ordered. Huffman also had positive Cologuard test and referral to Dr. John Sturgeon, GI provided to plan for colonoscopy.

52.     On October 25, 2021, Huffman was seen by Dr. Greenwood, Pulmonology. Dr. Greenwood recorded that Huffman had a history of at least 1 year of cough with sputum production that was difficult at times, usually clear without any hemoptysis. Huffman reported that it was very difficult to expectorate at times and she had not seen any significant benefit from Mucinex. Huffman reported that she did have an albuterol inhaler but that it was also unhelpful with cough situations. She also had wheezing and chest tightness and some chest pain described as a tightness feeling that accompanies exertional dyspnea. Her exertional dyspnea had been present for a year, with sob upon significant activity, and worse with activities such as climbing hills. Her albuterol inhaler had not been significantly helpful to try and combat her shortness of breath. She had taken Symbicort in the past, which caused thrush, so she was transitioned to Breztri which was

also not helpful. She also reported non-drenching night sweats, bronchitis symptoms, and hay fever sinus issues. Dr. Greenwood suggested trying Turns prior to bed to see if that would be helpful. Dr. Greenwood also reviewed Huffman's spirometry PFTS from 4/12/2021 finding FVC 2.65 F or 86% of predicted. FEV1 1.67 F or 73% of predicted. FEV1/FVC ratio 63. No significant improvement followed bronchodilator administration. TEC 4.56 F or 96% of predicted. RV 1.55 F or 90% of predicted. Diffusing capacity 10.7 mF/min/mmHg or 53% of predicted, consistent with mild obstruction, no significant postbronchodilator response, and diffusing capacity moderately reduced. Dr. Greenwood also reviewed Huffman's CT from May 2021, finding that the impression recorded elevation of the left hemidiaphragm without pleural effusion, pneumonia, pneumothorax. Benign calcified granulomas in the right lung and a minimal 2 mm nodule in the right middle lobe were present. The CT showed osteophytes at multiple thoracic levels, nodular T masses in the upper medial right breast, which was asymmetric compared to the left breast, and most likely represented fibroglandular tissue. Dr. Greenwood planned to continue albuterol as needed, try Stiolto, suggested a repeat screening CT in March, ordered a 6-minute walk for baseline, requested her records for review as well as her sniff testing, and images, and scheduled a return in 2 months.

53.    On November 24, 2021, Huffman was seen by Dr. Smith, who found that her breathing test showed mild decrease in capacity from normal and planned to continue Breztri 2 inhalation twice a day. Huffman was encouraged to quit smoking and return to office in 6 months with spirometry.

54.    On December 20, 2021, Huffman was seen by Dr. Michalski, for shingles.

55.    On January 11, 2022, Huffman was seen by Dr. Greenwood. Huffman requested a refill of the Stiolto inhaler and reported exertional dyspnea when doing some tasks. Huffman was to return in 6 months.

56.    On March 31, 2022, Huffman was seen by Dr. Suhel Kotwal, for evaluation of neck low back and right hip pain for several months duration. Huffman reported that her pain was insidious in onset, slowly progressing, waxing and waning in intensity, chronic and constant and progressing to the present state. Huffman described her pain as 5/10 in intensity, sharp in the beginning, dull aching later and radiating down to the R/L shoulder and upper extremity. Huffman reported that the pain is 60% neck, 40% arm, and extends past the elbow down to the hands. Huffman reported that she was unable to use her upper extremities without discomfort for prolonged duration and that her pain in the lower back radiated to both lower extremities in similar fashion. On exam Huffman demonstrated terminal restricted range of motion due to pain, forward flexion and extension to 45 degrees and lateral flexion to 45 degrees bilaterally, bilateral rotation 70 degrees and 5/5 strength and sensation intact. Dr. Kotwal reviewed x-rays of Huffman's cervical spine, finding the lateral view demonstrated mild disc space narrowing with early end plate sclerosis at C5/7 levels. X-ray's of Huffman's lumbar spine showed multilevel degeneration, and x-ray's of her hips showed bilateral moderate hip osteoarthritis. Dr. Kotwal ordered an MRI of Huffman's neck and low back. Dr. Kotwal recorded objects falling from Huffman's hand, gait instability, and balance issues, and suggested MRI because she had not improved with physical therapy and activity modification. Dr. Kotwal ordered an x-ray of right hip and scheduled a return in 3 weeks.

57.    On April 27, 2022, Huffman underwent MRI of cervical spine that found mild left fact degenerative hypertrophic change at C2-C3, mild left foraminal narrowing, and buckling of the ligamentum flavum. At C3-C4 there was mild-moderate right fat degenerative hypertrophic change. At C4-C5 there was mild left facet degenerative hypertrophic change and minimal left uncovertebral osteophyte formation and the findings were mild left foraminal narrowing. At C5-C6 there was mild-moderate disc space narrowing, ventral endplate osteophyte formation, mild facet degenerative change, and the findings were mild left foraminal narrowing. At C6-C7 there was mild to moderate disc space narrowing, ventral endplate osteophyte formation, mild broad-based posterior disc osteophyte formation, resulting in flattening of the ventral thecal sac, and the findings were mild central canal stenosis. Huffman's MRI found bilateral uncovertebral osteophyte formation results in mild-moderate left and mild right foraminal narrowing and the impression found multilevel cervical spondylotic change.

58.    On April 27, 2022, MRI of lumbar spine found L3-L4 mild right posterior lateral disc bulge with associated bilateral facet arthropathy and ligamentum flavum enlargement resulting in mild central stenosis and mild right neural foraminal narrowing. At L4-L5 there was mild diffuse posterior disc bulge and moderate bilateral facet arthropathy and ligamentum flavum enlargement resulting in mild central spinal stenosis and also with mild to moderate bilateral neural foraminal narrowing, left greater than right. At L5-S1 there was mild diffuse posterior disc bulge also noted to have bilateral posterior lateral disc bulge with mild bilateral facet arthropathy resulting in mild bilateral neural foraminal narrowing. There was also small fluid signal intensity and cystic intraosseous lesion

involving midline posterior elements of L5 is likely congenital incidental findings. Finally the MRI found mild L3 aterolisthesis with relation to L4 without spondylolysis.

59. On May 2, 2022, Huffman was seen by Dr. Kotwal to discuss MRI findings. Dr. Kotwal discussed that Huffman's MRI reported multilevel spondylosis with mild to moderate foraminal and lateral recess stenosis at various levels. Dr. Kotwal did not suggest surgical intervention, and instead recommended physical therapy and pain management with epidural steroid injections. Huffman was to return in 3 months.

60. On May 23, 2022, and June 28, 2022, Huffman was seen by Dr. Michalski, for weight management with phentermine.

61. On July 12, 2022, Huffman was seen by Dr. Greenwood, Pulmonology for shortness of breath. Huffman reported using Stiolto daily and albuterol stating that she had more trouble prior to heavy exertion. She also had chronic bronchitis issues and coughed up sputum frequently throughout the day. She was on inhaled steroids and was given a sample of Trelegy inhaler to begin using today. Dr. Greenwood planned to discontinue and abandon inhaled steroid therapy if she ran into the same problem. Dr. Greenwood reviewed Huffman's CT showing that her left diaphragm was elevated and likely at least weakened or paralyzed per her report. Dr. Greenwood opined that she still needed another screening CT chest in a year. Huffman was encouraged to work on exercise and dieting for weight loss to try and improve her stamina and her inhalers were continued without change. On exam, Huffman's lung sounds were mildly diminished throughout with remainder of exam normal. Dr. Greenwood planned to continue albuterol and Trelegy and scheduled a follow up in 6 months.

62.     On July 26, 2022, October 20, 2022, and December 15, 2022, Huffman underwent
        Lumbar ESI's.

63.     On April 4, 2023, Huffman underwent lumbar medial branch blocks at L4-5 and L5-S1
        performed by Dr. Daniel Kloster.

64.     On April 6, 2023, Huffman underwent a chest CT scan to screen for cancer, that showed
        millimetric pulmonary lung nodules. Examination of her lungs and airways found
        endobronchial mucous plugging in a subsegmental bronchus of the right lower lobe, and
        coronary and aortic atherosclerotic calcification.

65.     On April 18, 2023, Dr. Kloster recorded that immediately following the block procedure
        Huffman's pain was 90% better but after five hours the pain returned to baseline. Dr.
        Kloster's assessment and plan noted lumbar facet arthropathy, lumbar spondylosis
        without myelopathy, mild to moderate neural foraminal stenosis at L4-5, lumbar
        degenerative disc disease, L4-5 spondylolisthesis grade 1, cervical radiculopathy, cervical
        degenerative disc disease, cervical facet arthropathy, and chronic obstructive pulmonary
        disease. A second medial branch block with radio frequency lesioning was ordered.

66.     On May 23, 2022, Huffman was seen by Dr. Michalski.

67.     On June 6, 2023, Huffman was seen by Dr. Michalski, for pain in her back and shoulders.
        Dr. Michalski's exam showed decreased ROM in Huffman's bilateral shoulders and
        lumbar muscles. Dr. Michalski prescribed prednisone.

68.     On July 26, 2023, Huffman was seen by Dr. Curtis Whiting, Pulmonologist, for a 6-
        month follow-up. Dr. Whiting recorded that Huffman had a history off COPD, DOE, and
        diaphragmatic paralysis after COVID-19 infection. Huffman reported that she was using
        albuterol, Stiolto, and Duo-Neb, required prednisone on two separate occasions for

COPD exacerbation, had dyspnea on exertion with approximately 1 block, and had a constant cough with congestion and the sensation that she is unable to expectorate mucus. Dr. Whiting recorded that Huffman was medication compliant and uses albuterol approximately 1 time per week. Huffman had a CT in April 2023 which showed multiple tiny pulmonary nodules and mucous plugging in the right lower lobe, lung RADS 2. Dr. Whiting continued Stiolto, encouraged more frequent use of albuterol, suggested a repeat PFT, and another CT in April 2024. Huffman was to return in 3 months.

69.    On August 22, 2023, Huffman was seen by Dr. James Allen, Gastroenterology, for bloating, gas, and irregular bowel habits. Dr. Allen recommended a trial of PPI for dyspepsia, and to proceed with upper endoscopy if no improvement.

70.    On December 15 and 28, 2023, Lincoln referred Huffman's claim to Dr. Erika Quintana, a peer review physician. Dr. Quintana found that Huffman suffered from restrictions and limitations prior to March 7, 2021, that the medical records support restrictions and limitations, that Huffman's medical management was clinically reasonable and consistent with her conditions apparent severity, and that impairment was supported.

71.    Dr. Quintana did not perform a function-by-function analysis, did not speak with Huffman, did not speak with Huffman's treating physicians, and did not otherwise explain why her findings were contrary to the findings of Huffman's treating physicians.

72.    On January 17, 2024, Huffman responded to the report.

73.    Less than 24 hours later, on January 18, 2024, Lincoln denied Huffman's appeal.

74.    On July 14, 2024, Huffman again appealed Lincoln's denial.

75.    On July 30, 2024, Lincoln referred Huffman's claim for an internal nurse review.

76.    On August 19, 2024, Lincoln referred Huffman's claim to Dr. Peter Perdik, Pulmonologist, for review.

77.    On August 23, 2024, Lincoln informed Huffman that it required an extension to decide the claim. Lincoln did not explain why the extension was necessary.

78.    On August 26, 2024, Dr. Perdik completed his review and opined that there was no clinical documentation that supported pulmonary impairment until her formal pulmonary evaluation on March 8, 2021, where her pulmonary function was found to be moderately abnormal. Dr. Perdik found restrictions and limitations supported from March 8, 2021, to the present and that further improvement in her condition was not expected.

79.    Dr. Perdik did not perform a function-by-function analysis, did not speak with Huffman, did not speak with Huffman's treating physicians, and did not otherwise explain why his findings were contrary to the findings of Huffman's treating physicians.

80.    On September 6, 2024, Lincoln again extended the time to decide the claim, and again did not explain why the extension was necessary.

81.    On September 26, 2024, Lincoln informed Huffman that her claim was still being reviewed, and provided her with an August 12, 2024, nursing memo; an August 26, 2024, report by Dr. Perdik; an August 29, 2024, report by Dr. Ben-Meir; a September 16, 2024, Occupational Analysis; a September 20, 2024, Transferable Skills Analysis Addendum; and a September 25, 2024, revised report by Dr. Ben-Meir.

82.    Dr. Ben-Meir's August 29, 2024, report found that Huffman's medical records supported impairment consistent with her treating physician's restrictions and limitations, that Huffman was being treated clinically and consistently with the apparent level of the severity of her conditions, and that her COPD would adversely impact work.

83.    On September 23, 2024, Lindsay Mack, a Lincoln claim resolution specialist, requested a

clarification from Dr. Ben Meir, her email stated, "Also there was reference to the

claimant's diagnosis of COPD. Please note that the claimant's records have been

reviewed by a board certified pulmonologist, who did not find support for pulmonary

impairment from 3/23/20 to 03/7/21."

84.    In response to this clarification request, on September 25, 2024, Dr. Ben-Meir revised his

report finding that Huffman's functional impairment was not supported from May 2020

to May 2021, but that it was supported from May 7, 2021, to present and ongoing.

85.    Dr. Ben-Meir was not provided additional medical records, did not perform a function-

by-function analysis, did not speak with Huffman or her treating physicians, and did not

explain why he found Huffman to be orthopedically unimpaired before March 7, 2021, or

otherwise support his conclusion.

86.    On November 1, 2024, Lincoln upheld its denial of benefits.

87.    Lincoln based this second denial on Dr. Perdik's report and Dr. Ben-Meir's amended

report.

88.    Huffman has submitted a colorable claim for benefits to Lincoln.

89.    Huffman has at all relevant times met the definition of "Disability" under the Plan and is

entitled to benefits.

90.    Huffman has exhausted her administrative remedies and Lincoln refuses to take further

action in connection with her claim.

<u>CAUSES OF ACTION</u>

COUNT I
29  U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF
BENEFITS

16

91.    Huffman realleges the preceding paragraphs as if fully set forth herein.

92.    Huffman is entitled to all unpaid and accrued LTD benefits, as Lincoln:

93.    a.  Made an unfavorable decision without substantial evidence;

94.    Failed to properly consider Taylor's medical impairments and resulting limitations; and

95.    Issued an unfavorable decision that was arbitrary and capricious.

96.    Lincoln has not satisfied its obligation to pay Huffman's LTD benefits.

97.    Lincoln denied LTD benefits when the applicable medical record supports upholding LTD benefits.

98.    WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Huffman prays for judgment against Lincoln for unpaid LTD benefits, attorney's fees, costs, and prejudgment interest.

COUNT II
29  U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

99.    Huffman realleges the preceding paragraphs as if fully set forth herein.

100.    Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

101.    "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property or such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

102.

103.    29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

104.    "a fiduciary shall discharge her duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

105.    Lincoln, the Plan's designated claims administrator, is a fiduciary.

106.    Lincoln participated in and benefitted from the Plan as previously indicated.

107.    Lincoln's claims management practices are motivated by financial incentives in its administrative services agreement with Essilor.

108.    As the payor of benefits and the entity responsible for exercising discretion in claims administration, Lincoln operates under an inherent conflict of interest.

109.    A higher than marketplace quality standard, as set forth in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 128 (2008) governs the actions of a fiduciary.

110.    Lincoln breached its fiduciary duty in:

    a.    Failing to comply with its internal guidelines and claims handling procedures. Its claim handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving coverage and eligibility determinations;

    b.    Refusing to administer the claim when the 180-day deadline was extended by National Emergency;

    c.    Failing to properly administer the claim;

    d.    Engaging in a structural conflict of interest by assuming the role of both claims administrator and payor of benefits;

18

    e.   Failing to properly consider competent medical and vocational opinion evidence, and/or failing to specifically explain why it did not agree with such evidence;

    f.   Failing to provide a copy of the applicable policy and documents; and

    g.   Refusing to utilize fully executed authorizations to attempt to obtain all relevant evidence to Huffman's claim for benefits;

111.   Lincoln denied Huffman's LTD benefits for the purpose of elevating its financial interests. In doing so, it breached its fiduciary duties.

112.   Lincoln failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both Huffman and the Plan's participants and beneficiaries generally.

113.   Lincoln's improper conduct demonstrates that ordinary relief under § 1132(a)(1)(B) is not an adequate remedy.

114.   Lincoln's violations of regulations alone allow Huffman the right to pursue any remedy under Section 502(a) of ERISA, including § 1132(a)(3). 29 C.F.R. § 2560.503-1(1)(2)(i).

115.   Lincoln's violations of federal regulation also subject its decision to *de novo* review.

116.   WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), § 1109, and § 1132(a)(2), Huffman prays for an order that Lincoln retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by Lincoln in its fiduciary capacity; for an equitable accounting of benefits that Lincoln has withheld; for the disgorgement of profits enjoyed by Lincoln in withholding benefits; for restitution under a theory of

surcharge; for the Court's imposition of a constructive trust; for an award of attorney

fees; and for further relief as the Court deems just.


Respectfully submitted,


BURNETTDRISKILL, Attorneys

By: /s/ Benjamin Narrell
Benjamin Narrell #79228
Derrick Pearce #16752
103 W 26th Ave., Ste. 290
North Missouri City, MO
64116
P: 816.781.4836
F: 816.792.3634
bnarrell@burnettdriskill.com
dpearce@burnettdriskill.com
ATTORNEYS FOR PLAINTIFF